UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

FIDELITY MANAGEMENT TRUST COMPANY, as Collateral Agent for Mellon Bank, N.A., as Trustee of Bell Atlantic Master Trust with Respect to Account C,

*Plaintiff and counter-claim defendant*

v.

RICCARDO OLIVIERI, an individual,

*Defendant and counter-claim plaintiff*

Civil Action No. 04-cv-11873-NMG

**AMENDED ANSWER AND COUNTERCLAIM**

Pursuant to F.R.Civ.P. 15(a), the Defendant amends his answer previously filed as follows.

The Defendant responds to the complaint filed herewith with respect to each paragraph thereof as follows:

1. Paragraph 1 states only legal conclusions, and no response is required.

2. The Defendant has no knowledge with which to admit or deny the allegations of paragraph 2.

3. With respect to paragraph 3, the Defendant admits that he is an Italian citizen, and admits that at the time of the transactions complained of, he had an address as indicated therein.

4. Paragraph 4 states only legal conclusions, and no response is required.

5. Paragraph 5 states only legal conclusions, and no response is required. The Defendant admits that the language quoted accurately sets forth the language in the Guaranty referred to in the Complaint.

6. The Defendant denies the allegations of paragraph 6.

7. The Defendant admits the allegations of paragraph 7.

8. The Defendant admits the allegations of paragraph 8.

9. The Defendant states that the documents identified in paragraph 9 of the Complaint speak for themselves.

10. The Defendant states that the documents identified in paragraph 10 of the Complaint speak for themselves.

11. The Defendant states that the documents identified in paragraph 11 of the Complaint speak for themselves.

12. The Defendant admits the allegations of paragraph 12. The Defendant admits that the language quoted accurately sets forth the language in the Guaranty referred to in the Complaint.

13. The Defendant admits that the language quoted in paragraph 13 accurately sets forth the language in the Guaranty referred to in the Complaint.

14. The Defendant admits that the language quoted in paragraph 14 accurately sets forth the language in the Guaranty referred to in the Complaint.

15. The Defendant admits the allegations of paragraph 15.

16. Paragraph 16 states only legal conclusions, and no response is required

17. The Defendant admits the allegations of the first sentence of paragraph 17 to the extent that no payment was made to the Purchasers by FDA on July 31, 2003. The remainder of paragraph 17 states only legal conclusions, and no response is required.

18. The Defendant denies the allegations of paragraph 18.

19. The Defendant denies the allegations of paragraph 19.

20. The Defendant reiterates his responses to paragraphs 1 through 19.

21. The Defendant denies the allegations of paragraph 21.

22. The Defendant denies the allegations of paragraph 22.

23. The Defendant denies the allegations of paragraph 23.

24. The Defendant reiterates his responses to paragraphs 1 through 23.

25. The Defendant denies the allegations of paragraph 25.

26. The Defendant denies the allegations of paragraph 26.

27. The Defendant denies the allegations of paragraph 27.

28. The Defendant reiterates his responses to paragraphs 1 through 27.

29. The Defendant denies the allegations of paragraph 29.

30. The Defendant denies the allegations of paragraph 30.

31. The Defendant denies the allegations of paragraph 31.

32. The Defendant reiterates his responses to paragraphs 1 through 31.

33. The Defendant denies the allegations of paragraph 33.

34. The Defendant denies the allegations of paragraph 34.

35. The Defendant denies the allegations of paragraph 35.

36. The Defendant reiterates his responses to paragraphs 1 through 35.

37. The Defendant denies the allegations of paragraph 37.

38. The Defendant denies the allegations of paragraph 38.

39. The Defendant denies the allegations of paragraph 39.

40. The Defendant denies the allegations of paragraph 40.

## Affirmative Defenses

### FIRST AFFIRMATIVE DEFENSE

The Complaint, in whole or in part, fails to state a claim for which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

This action is barred in whole or in part because of the plaintiff's failure to mitigate its damages.

### THIRD AFFIRMATIVE DEFENSE

This action is barred because the defendants acted fairly and equitably toward the plaintiff.

### FOURTH AFFIRMATIVE DEFENSE

If the plaintiff was harmed at all, which defendant denies, such harm, in whole or in part, was caused or contributed by the acts or omissions of parties over whom the defendant had no control and for whose actions it is not legally responsible.

### FIFTH AFFIRMATIVE DEFENSE

If the plaintiff was harmed, which the defendant denies, such harm, in whole or in part, was caused or contributed by the plaintiff's failure to act in good faith and deal fairly with the defendant under the contract between them.

### SIXTH AFFIRMATIVE DEFENSE

The plaintiff is estopped by its conduct from asserting its claims.

**SEVENTH AFFIRMATIVE DEFNSE**

The plaintiff, by its conduct, has waived any claims it may have against the defendant.

**EIGHTH AFFIRMATIVE DEFENSE**

If defendant breached any contract between the parties, which the defendant denies, the plaintiff's cause of action is barred by the doctrine of laches.

**NINTH AFFIRMATIVE DEFENSE**

Plaintiff's claim is barred by the laws of the state of Florida regulating usurious loans.

**COUNTERCLAIM**

**A. Background**

By way of counterclaim, and without waiving his right to seek transfer of this case to the United States District Court and United States Bankruptcy Court for the Southern District of Florida, the defendant Riccardo Olivieri as counterclaim plaintiff complains of the plaintiff individually as counterclaim defendant as follows:

1. Florida Development Associates, LTD ("FDA") owns and is developing real property located in Miami-Dade County. Specifically, FDA is developing two condominiums located in Miami Beach, Florida known as the Bentley Bay North Tower ("North Tower") and Bentley Bay South Tower ("South Tower") (collectively, the "Property").

2. Mr. Olivieri is a principal of FDA and holds a substantial equity interest therein.

3. In order for FDA to purchase the land and commence the project known as

Bentley Bay (the "Project"), FDA obtained a construction loan ("Construction Loan"). On December 6, 2000, FDA, through its General Partner, executed and delivered to Colonial Bank ("Colonial") a Promissory Note in the original principal amount of $48,000,000 ("Note"). Payment of the Note is secured by a certain Mortgage and Security Agreement (the "Mortgage"). The Mortgage contained a security agreement which granted Colonial a blanket security interest in all of FDA's assets. Colonial provided FDA with additional funding, and holds a first mortgage on the Property, subject to all of FDA's rights, claims and defenses including claims of setoff.

4. Prior to Colonial's agreeing to fund the Construction Loan, FDA was required to have sufficient capital invested in the Project. FDA's then-existing equity owners had invested approximately $5.2 million in the Project. However, Colonial demanded and required an additional $14.5 million in equity prior to funding the Construction Loan.

5. Accordingly, FDA retained Madison Capital to assist it in obtaining mezzanine financing to obtain the necessary equity investment in the Project. Mezzanine financing is an investment vehicle commonly used in real estate developments providing the developer with additional investment in the Project. Mezzanine financing does not rely on the value of the real estate but on the sell out value of the Project.

6. As a result of the efforts of Madison Capital, FDA received various offers, and selected GTE Service Corporation ("GTE Service") and GTE Service Corporation Plan for Employees' Pension Trust (collectively "GTE") to act as the mezzanine financer for the Project and meet the condition precedent of the Construction Loan.

7. Simultaneously with the closing of Colonial Construction Loan, GTE and

certain of its affiliates, acting through Fidelity, entered into a Security Purchase Agreement ("Agreement") with FDA at a formal closing in Miami, Florida. Mr. Olivieri was also made a party to the Agreement as a Principal and executed the contract in his individual capacity. The Agreement provided FDA with the additional capital investment funding required by Colonial in the amount of $14.5 million.

8. The Agreement was collateralized by FDA's equity and not by the Project or Property. At all times material hereto, the Agreement set forth all terms and conditions of GTE's investment in the Project and controlled the source, amount, use and allocation of the funds being provided under the Agreement.

**B. <u>The GTE Service and GTE Pension Plan's Investment in the Project through the Security Purchase Agreement</u>**

9. The Agreement required FDA to issue to GTE Pension Plan a "Promissory Note" (the "Note") in the amount of $14.5 million. Immediately upon issuance of the Note, the Agreement provided that GTE Pension Plan would sell the "Note" to GTE Service, its Plan Administrator.

10. The Agreement also provided that upon purchase of the "Note", GTE Service, as purchaser of the Note, would fund the sum of $14.5 million in an escrow account at UMB Bank which is located in Kansas City, Missouri. Thus, upon funding of the Note, FDA would have sufficient equity investment in the Project to obtain the Construction Loan. However, the Agreement specifically restricted the disbursement, use and allocation of the money.

11. The Agreement required FDA to execute a Cash Management Agreement which agreement governed the use of the money in escrow. Specifically, the Cash

Management Agreement required that the monies GTE Service invested would be held in escrow at UMB Bank and would be released only upon FDA's compliance with the terms of the Cash Management Agreement.

12. As set forth above, although the monies were funded in December 2000, FDA did not have access to all the monies on said date. Pursuant to the Cash Management Agreement, any money provided to FDA pursuant to the Agreement and Note needed to be approved in advance by GTE Service in its discretion.

13. The Agreement and "Note" provided that although the sums were funded from UMB Bank by GTE Service as purchaser of the "Note," Debtors were required to repay the monies due under the Agreement and "Note" to Bankers Trust n/k/a Deutsche Bank in New York as agent for GTE Pension Plan, the seller of the "Note."

14. The Agreement also required the partners of FDA, Bentley Bay and Development Associates, to execute a Pledge Agreement requiring them to pledge all their ownership interests in FDA to Fidelity as collateral agent for the Note Purchaser pursuant to the Collateral Agency Agreement.

15. Mr. Olivieri, as a Principal to the Agreement, was also required by GTE to execute a Guaranty requiring him to guarantee repayment of all sums due under the "Note."

16. The structure set forth in the Agreement allowed FDA to meet the condition precedent of the Construction Loan by obtaining mezzanine equity financing from GTE. The relevant documents establish that: i) the Construction Loan required and described the sums GTE provided to FDA as equity; ii) GTE was not secured by any real property;

and iii) GTE actively participated in the construction and management of the Project. GTE always looked toward the sell out of the Project and equity in the project as its source of repayment of its equity investment in the Project.

17. This scheme provided GTE the opportunity to invest its money in a real estate project in Miami, Florida while disguising the transaction as a loan through the use of an alleged "Note." GTE Service was not a note purchaser or lender but in fact was an investor in the project through GTE Pension Plan.

18. Bell Atlantic, as successor in interest to GTE, maintains that it is a lender entitled to an interest of 29.821% from the Debtor under the terms of the Agreement. Bell Atlantic -- through its Collateral Agent Fidelity – has further maintained that it is entitled to recover that same interest of 29.821% from Mr. Olivieri under the terms of the Guaranty.

19. GTE structured the "loan" to FDA in a manner that provided the appearance that the sums being provided were a legitimate loan and the most beneficial to FDA when in fact GTE was attempting to structure this transaction as a means to evade Florida's usury laws in order to legitimize its charge of usurious interest on the money provided FDA in order to obtain the highest rate of return on its investment.

20. GTE structured the financing in this case as a mezzanine "loan" which provided for a monthly compounding of interest on the "note." Assuming GTE is deemed a lender and not an equity investor, the "Note" provides that GTE would receive a 29.821% return on the investment. Knowing that Florida law specifically prohibited the charging of a usurious interest rate, GTE drafted the Note, Agreement and Guaranty to provide that Massachusetts law rather than Florida law would apply, believing that

Massachusetts had more favorable usury laws allowing GTE to obtain a rate of return on this investment which was otherwise illegal in Florida.

21. As a result of the Agreement and its related documents, including the Cash Management Agreement and the Guaranty, GTE obtained significant control of FDA's Project, FDA's day to day operations and FDA's use of the $14.5 million. In addition, pursuant to article nine of the Agreement, GTE set forth in specific detail how the project was to be operated and "loan" sums released from escrow.

**C. GTE seizes significant control of the Project excluding FDA and Mr. Olivieri from management or development of the Project.**

22. Specifically, FDA and Mr. Olivieri could not make any changes to any contract, the Plans or Specifications, modify the terms of the sale of the Units, enter into a lease, amend or alter the marketing plan without GTE or its agent's prior approval and consent. See Agreement at ¶¶ 9.4. and 9.10 and 9.30. FDA and Mr. Olivieri, as Principal, could only use the funds provided pursuant to the Budget after complying with all terms and conditions of the Cash Management Agreement regarding the request and disbursement of the funds. See *Id.* at ¶ 9.6, see also Cash Management Agreement. GTE obtained unrestricted access to the Property and Project and in fact hired its own construction manager, Wellbro Construction, to monitor the development of the Project. See *Id.* at ¶ 9.10.

23. From the inception of the Project, FDA and Mr. Olivieri vigorously attempted to develop the Project and Property. However, GTE and Colonial, through their respective agreements and agents, engaged in numerous instances of blatant non-cooperation, which impeded FDA's ability to complete construction of the Project and

ultimately lead to FDA having to file for protection under Chapter 11.

24. At the inception of the Project, Colonial appointed a Project inspector and hired Keystone Construction as the construction company. It would have been in the best interests of the Project to replace Keystone and the Project inspector.

25. Despite repeated demands of FDA and Mr. Olivieri that Keystone and the Project inspector be removed from the Project, GTE and Colonial failed and refused to do so. GTE, through its agent Fidelity, managed the Project without consulting in any meaningful way with FDA and Mr. Olivieri. As a result, the Project produced substandard, defective and delayed work. Despite the demands of FDA and of Mr. Olivieri, FDA and Mr. Olivieri were excluded from most of the decisions made on the Project.

26. On June 30, 2000, Verizon Communications was formed as a result of the merger between GTE Corporation and Bell Atlantic Corporation. Verizon Investment Management Corp is the asset management subsidiary of Verizon Communications. On November 27, 2000, Verizon Communications selected Mellon Financial Corporation, through its Global Securities Services Group, as master trustee for the assets of the former GTE defined benefit plan and Bell Atlantic defined benefit plan. Mellon is headquartered in Pittsburgh, Pennsylvania. Bell Atlantic filed a proof of claim in the Bankruptcy proceedings of FDA, and is the successor in interest to GTE. Bell Atlantic has alleged claims against the Debtors based upon the Agreement and related documents.

**D. <u>The Interest Rate on the Promissory Note</u>**

27. Bell Atlantic is an equity investor in the Property, and not a lender, and must now look to the sell out value of the Project to obtain a return on its investment. To the

extent that Bell Atlantic is a lender, Florida law and not Massachusetts law bears a normal relation to the "Note" and Guaranty and pursuant to Florida law the "Note" and Guaranty are usurious and in violation of Florida's usury laws.

28. Pursuant to the terms of the Note, GTE "lent" Debtor $14,500,000.00 under a Note which matured on December 6, 2003 (the "Maturity Date"). Paragraph 3.1 of the Note, entitled *Calculation of Interest*, provides in pertinent part:

> The principal balance of this Note and any and all other amounts owing by [Debtor] to [GTE] under this Note or any other Transaction Document **shall bear interest at the rate of twenty-one percent (21%) per annum, compounded monthly in arrears (the "Interest Rate")** (Emphasis added)

(referred herein as the "Interest Calculation").

29. Applying the Interest Calculation set forth in the Agreement, FDA allegedly owed Bell Atlantic on the Maturity Date the total sum of $27,472,284.00 which represents $14,500,000.00 of principal and $12,972,284.00 of interest. Consequently, Mr. Olivieri allegedly owed to Bell Atlantic that same amount under the terms of the Guaranty.

30. As evidenced by the Note Interest Schedule, GTE compounded the interest accrued on the Note by compounding the interest on a monthly basis. Thus, every month, the monthly accrued interest was added to the principal balance resulting in a new principal balance and then recalculating the monthly interest accrual based on the new principal balance.

31. This compounding of interest on a monthly basis increased the yield on the "loan" above the 21% stated rate of the Note. As a result, the Note and the related Guaranty were rendered usurious under §687.071, Florida Statutes (2003). Specifically,

the interest rate on the loan and thus the Guaranty is 29.821%, which is 4.821% greater than what is allowed under Florida law. *See* §687.071, Fla. Stat.

32. All of the events complained of by Bell Atlantic and by GTE were knowingly undertaken by their agent Fidelity, as described above and in paragraph 40 hereof.

**COUNT I**

**Cancellation of the sums due Bell Atlantic pursuant to Fla. Stat. §687.071**

33. Mr. Olivieri reasserts the allegations set forth in paragraphs 1 through 32.

34. Pursuant to the Agreement, FDA executed a "note" in favor of GTE Pension Plan. This Note was immediately purchased by GTE Service. As more fully described in the Agreement, FDA received $14,500,000.00. The "Note" was secured by FDA's equity interest and guaranteed by Mr. Olivieri pursuant to the terms of the Guaranty. Upon information and belief the "Note" has been assigned to Bell Atlantic as successor in interest to GTE.

35. GTE Service was a subsidiary of GTE Corporation, a New York corporation with its headquarters in Irving, Texas. Pursuant to the Agreement, GTE Service's bank was UMB Bank located in Kansas City, Mo.

36. GTE Pension was an affiliate and subsidiary of GTE Service. Pursuant to the Agreement, GTE Pension's bank was Deutsche Bank located in New York. All payments due by FDA under the Agreement, were payable to Deutsche Bank in New York.

37. Mr. Olivieri executed the Guaranty in New York City, New York because he happened to be visiting there at the time. Mr. Olivieri did not conduct any business

related to the Project in the State of Massachusetts, including the negotiations of both the Agreement and the Guaranty.

38. The interest rate on the "Note" and therefore on the Guaranty provides for an interest rate compounded monthly totaling 29.821% per annum, simple interest. This rate of interest exceeds that which is allowed pursuant to Florida law.

39. The Note and the Guaranty provide that Massachusetts law and not Florida law governed the "Note" and Guaranty. Massachusetts bears little or no relation to the loan and documents at issue. The only relation the "Note" and Guaranty may have with Massachusetts is that Fidelity, which is located in Massachusetts, was selected as GTE's financial advisor. However, Mellon Bank, Bell Atlantic's investment manager today is located in Pennsylvania.

40. At all times material hereto, Fidelity acted solely as a trustee, collateral agent, trustee and/or investment advisor on behalf of GTE. Fidelity's offices and headquarters are located in Massachusetts. Thus, by engaging Fidelity as its servicing agent, GTE Service attempted to create a "normal relationship" for its "loan" to FDA with Massachusetts knowing that only Massachusetts law would legitimize its charge of usurious interest on the "loan" to FDA. Mr. Olivieri asserts that this "relation" is tenuous and insufficient as a matter of law to sustain the choice of law provision in either the "Note" or the Guaranty.

41. At all times material hereto, GTE and Fidelity knew that FDA was located in Florida and the purpose of its loan was to develop the Property located in Miami-Dade County, Florida. Massachusetts has no connection or relation to the transaction at issue between FDA, Mr. Olivieri, and Bell Atlantic. The documents underlying this transaction

were neither executed nor delivered by Mr. Olivieri or FDA in or to Massachusetts. The sums provided and paid under the Agreement were not paid in Massachusetts. The primary negotiations in this transaction occurred in Florida and not in Massachusetts. The Property and Project that are the subject matter of the "loan" and all security provided under the Agreement and "Note" are located in Florida. All monies provided pursuant to the Agreement were to be used in the Property and Project in Florida. The closing of the transaction occurred in Miami, Florida. Thus, Massachusetts has no normal relationship with the transaction.

42. Rather, this transaction has a normal relationship to Florida. Thus, Florida law and not Massachusetts law should govern the transaction.

43. Bell Atlantic knowingly charged interest on the Note and Guaranty at a rate in excess of the amount allowed by Florida law, as codified in §687.071, Fla. Stat., and as evidenced by the Note and its Interest Schedule.

44. Because Bell Atlantic's interest calculation has rendered the "loan" and Guaranty usurious and in violation of §687.071, Fla. Stat., the "loan" and its related Guaranty is an unenforceable debt in Florida and should be determined entirely unenforceable.

**COUNT II**

**Recharacterization of Bell Atlantic's "debt" as equity**

45. Mr. Olivieri reasserts the allegations set forth in paragraphs 1 through 32.

46. Pursuant to the Security Purchase Agreement and related documents, GTE was aware that FDA required $14.5 million in additional investment in the Project as a

condition precedent to obtaining the Construction Loan.

47. GTE agreed to provide FDA with a mezzanine equity financing pursuant to an Agreement in order to meet the condition precedent of the Construction Loan.

48. At the time that GTE agreed to provide the equity financing, GTE was aware that Colonial would obtain a first mortgage secured by all real property.

49. The Agreement itself sets forth that the sums being provided by GTE were an investment.

50. GTE's equity investment was secured by the FDA partners' equity in the Project. At all times, GTE looked to the sell out of the Project to repay it the sums invested. Any ultimate repayment to GTE of the debt was dependent upon the profitability of the Project and its sell out.

51. Pursuant to the Agreement and Cash Management Agreement, GTE and its Collateral Agent Fidelity obtained and seized significant control of the Project and its daily operations thereby dominating the affairs of FDA in its capacity as equity and not as a lender to the Project.

52. Based on the foregoing, the sum due Bell Atlantic is not a loan but rather an equity investment in the Project. Thus, Bell Atlantic's "debt" should be recharacterized to an equity claim against FDA and Mr. Olivieri should be relieved of his obligations to Bell Atlantic and Fidelity under the Guaranty.

## COUNT III

### Claim for Declaratory Judgment That Mr. Olivieri Should Be Relieved of His Obligations Under the Guaranty Because Bell Atlantic and Fidelity Mismanaged FDA In Such A Way As To Harm Mr. Olivieri's Interest

53. Mr. Olivieri reasserts the allegations set forth in paragraphs 1 through 32.

54. A creditor owes an obligation not to deal with a debtor or any security for the debt in such a manner as to harm the interest of the guarantor. As such, both GTE and its Collateral Agent Fidelity owed Mr. Olivieri a duty not to deal with FDA in such a manner as to harm his interest.

55. GTE and Fidelity breached this duty owed to Mr. Olivieri. After indirectly seizing control of FDA by means of their relationship that was both contractual and fiduciary in nature, they proceeded to mismanage and mishandle the Project, producing substandard, defective and delayed work, and caused FDA to suffer significant financial damage as a result.

56. As a direct and proximate result of the foregoing breach and the attendant financial damage suffered by FDA, Mr. Olivieri has suffered substantial harm.

**COUNT IV**

**Breach of Fiduciary Duty Claim**

57. Mr. Olivieri reasserts the allegations set forth in paragraphs 1 through 32.

58. GTE and its Collateral Agent Fidelity owed Mr. Olivieri a fiduciary duty to act in his and therefore FDA's best interests because of the special relationship that arose between them. Based upon their actions and representations to him, Mr. Olivieri became dependent on and reposed special confidence in these Defendants to cooperate with him and FDA in properly and adequately constructing and developing the Project, managing the Property and abiding by their obligations under the Agreement and its related documents in good faith.

59. GTE and Fidelity breached their fiduciary duty to Mr. Olivieri by exercising their influence and superiority over him to seize control of the Project to the exclusion of FDA and Mr. Olivieri and then proceeding to mismanage the Project.

60. As a direct and proximate result of the foregoing, Mr. Olivieri has suffered substantial harm.

61. The conduct of Fidelity was wrongful, without justification or excuse and contrary to generally acceptable standards. The acts above described were committed in wanton and willful disregard of Mr. Olivieri's rights and represent unconscionable and unjustifiable conduct.

WHEREFORE DEFENDANT REQUESTS that this Court:

a) Enter a judgment in his favor on all counts set forth in the complaint;

b) Decree that any obligations owing by FDA and described herein, and therefore the Guaranty, are unenforceable;

c) Decree that any so-called obligations owing by FDA and described herein, should be recharacterized as equity, and that therefore Mr. Olivieri is relieved of his obligations under the Guaranty;

d) Award damages to Mr. Olivieri; and

e) Award him costs and attorneys fees to the extent permitted by law.

**DEFENDANT DEMANDS A JURY ON ALL ISSUES SO TRIABLE.**

RICCARDO OLIVIERI
By his attorneys,

*/s/ Richard L. Levine*

Richard L. Levine (BBO#297040)
Kenneth J. DeMoura (BBO#548910)
ADLER POLLOCK & SHEEHAN
175 Federal Street
Boston, MA 02110
Tel: (617) 482-0600
Fax: (617) 482-0604
kdemoura@apslaw.com
rlevine@apslaw.com

Dated: October 28, 2004