**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FIDELITY MANAGEMENT TRUST COMPANY, as Collateral Agent for Mellon Bank, N.A., as Trustee of Bell Atlantic Master Trust with Respect to Account C )))) | |
| ) | Civil Action No. 04-cv-11873 NMG |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| RICCARDO OLIVIERI, an individual ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |
| ) | |

## COUNTERCLAIM DEFENDANT AND PLAINTIFF FIDELITY MANAGEMENT TRUST COMPANY'S ANSWER TO COUNTERCLAIM PLAINTIFF AND DEFENDANT RICCARDO OLIVIERI'S COUNTERCLAIMS

Fidelity Management Trust Company ("Fidelity"), as collateral agent and investment manager and not individually, on behalf of Mellon Bank, N.A. ("Mellon"), as Trustee of the GTE Service Corporation Plan for Employees' Pensions Trust with respect to Account No. 176230 ("GTE Pensions Trust"), *n/k/a* the Bell Atlantic Master Trust with respect to Account C ("Bell Atlantic Master Trust," collectively with GTE Service Corporation, "Plaintiffs") answer the counterclaims of Riccardo Olivieri, as follows:

**A.    Background**

1.    Plaintiffs admit that FDA owns and is developing a condominium project located in Miami Beach, Florida, known as the Bentley Bay North Tower and Bentley Bay South Tower (the "Project").

2.    Plaintiffs admits the allegations of paragraph 2.

3.     Plaintiffs admit the allegations in the first and second sentences of paragraph 3. Answering further, Plaintiffs admit the allegations in the third sentence of paragraph 3 insofar as such allegations refer to that certain Mortgage and Security Agreement dated December 6, 2000 ("Mortgage and Security Agreement") by and between FDA and Colonial Bank ("Colonial"). Plaintiffs admit that Colonial, pursuant to the Mortgage and Security Agreement, was granted a first priority lien on substantially all of FDA's assets.  Answering further, Plaintiffs admit that Colonial provided FDA with additional funding.  Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in the last sentence of paragraph 3 and therefore deny the remaining allegations in the last sentence of paragraph 3 and the remaining allegations in paragraph 3.

4.     Plaintiffs admit that prior to Colonial funding the Construction Loan (defined below), FDA was required to have separate debt financing for the Project sufficient to complete the Project when the amount of such financing was added to the amount of the Construction Loan.  Answering further, Plaintiffs admit that pursuant to the Securities Purchase Agreement, FDA's shareholders were required to contribute equity to FDA in the amount of approximately $5.2 million.  Plaintiffs admit that prior to funding the Construction Loan, Colonial required FDA to obtain an additional $14.5 million in debt financing.  Plaintiffs deny the remaining allegations in paragraph 4.

5.     Plaintiffs admit that FDA retained Madison Capital to assist FDA in obtaining mezzanine debt financing for the Project.  Answering further, Plaintiffs deny the remaining allegations in the first sentence of paragraph 5.  Answering further, Plaintiffs admit that mezzanine financing is an investment vehicle commonly used in real estate development

providing the developer with debt financing in such projects.  Plaintiffs deny the remaining

allegations in paragraph 5.

6.      Plaintiffs admit that Fidelity provided a term sheet to FDA concerning a potential

loan to FDA to be used to finance the Project.  Plaintiffs deny that GTE Service Corporation

currently exists or acted as plan administrator for GTE Service Corporation Plan for Employees'

Pension.  Plaintiffs further state that GTE Service Corporation was not involved in any way with

the negotiation, issuance or administration of GTE Pension Trust's loan to FDA or subsequent

monitoring of the Project.  Plaintiffs state that FDA accepted Fidelity's term sheet because it was

the most favorable to FDA and the proposed interest rate for the loan was consistent with

industry standards for real estate development transactions similar to the Project.  Plaintiffs admit

that FDA received offers from several other companies concerning potential loans to FDA.

Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations contained in paragraph 6 and therefore deny the remaining allegations in

paragraph 6.

7.      Plaintiffs admit that on December 6, 2000, the same day FDA obtained a

construction loan (the "Construction Loan") from Colonial in the amount of $48,000,000, FDA

also entered into a loan transaction and related agreements with Bankers Trust as Trustee for

GTE Pensions Trust and with Fidelity acting as discretionary investment manager and collateral

agent on behalf of GTE Pensions Trust.  As discretionary investment manger, Fidelity had

absolute discretion to make the loan to FDA on behalf of GTE Pensions Trust.  The transactions

and agreements included (i) a Securities Purchase Agreement, (ii) a Promissory Note (the

"Note"), (iii) a Pledge Agreement, and (iv) the Guaranty (collectively, with the other documents

executed therewith, the "Transaction Documents.")  Answering further, Plaintiffs deny all

remaining allegations in the first sentence of paragraph 7. Plaintiffs state that no closing on the

various transactions contemplated by the Transaction Documents occurred in Miami, Florida.

Rather, the Transaction Documents themselves were collected and held by Fidelity's counsel in

Massachusetts, Mr. Olivieri's signatures on the Transaction Documents, other than the Note,

were delivered to Fidelity in Massachusetts and Fidelity's decision to close on the Note and fund

the Note purchase price was made in Massachusetts. Additionally, Mr. Olivieri physically

signed the Note on behalf of FDA in New York at the offices of Fidelity's counsel and delivered

the Note to Fidelity's counsel in those offices. Answering further, Plaintiffs admit Riccardo

Olivieri, president of Bentley Bay G.P. Corp. ("Bentley Bay"), the general partner of FDA, was a

party to both the Securities Purchase Agreement and the Guaranty in his individual capacity.

Answering further, FDA authorized the issuance and sale to Bankers Trust as Trustee of GTE

Pensions Trust of up to $14,500,000 of Notes. Pursuant to the terms of the Note, FDA, as maker,

issued the Note, with a face value of $14,500,000 to Bankers Trust as Trustee of GTE Pensions

Trust as the Note holders. Plaintiffs state that the financing provided to FDA pursuant to the

Securities Purchase Agreement and the Note was never described as "capital" or "equity" but

was always treated as an unsecured loan in the Transaction Documents, the Construction Loan

documents, FDA's audited and unaudited financial statements, and in FDA's bankruptcy

schedules. Answering further, Plaintiffs deny the remaining allegations in paragraph 7.

       8.     Plaintiffs deny the allegations in the first sentence of paragraph 8. Answering

further, Plaintiffs state that pursuant to the Pledge Agreement, Bentley Bay and Development

Investors, L.P., Inc. ("Development Investors"), FDA's limited partner, pledged to Fidelity (i) all

of their respective ownership interests in FDA and (ii) all obligations owing by FDA to each of

them respectively. UCC-1 Financing Statements were duly filed by Bentley Bay and

Development Investors respectively, to evidence the pledge of such security to Fidelity. Answering further, Plaintiffs deny the allegations in the second sentence of paragraph 8. Plaintiffs state that the Transaction Documents in their entirety, including the Securities Purchase Agreement, as well as the construction budget provided by FDA to Fidelity, set forth the entire understanding of the parties concerning the loan to FDA and the use of those loan proceeds.

9.     Plaintiffs admit that the Note in the amount of $14.5 million was issued by FDA to Bankers Trust as Trustee of GTE Pensions Trust pursuant to the terms of the Note and the other Transaction Documents.  Answering further, Plaintiffs deny the remaining allegations in paragraph 9.

10.     Plaintiffs deny the allegations in paragraph 10.  Plaintiffs state that the loan to FDA, in the form of the Note, provided sufficient debt financing for FDA to satisfy the condition precedent for issuance of the Construction Loan.  Plaintiffs state that the financing provided to FDA was never described as "capital" or "equity" but was always treated as an unsecured loan in the Transaction Documents, the Construction Loan documents, FDA's audited and unaudited financial statements, and in FDA's bankruptcy schedules.  Answering further, Plaintiffs state that pursuant to § 3.2 of the Securities Purchase Agreement, and consistent with industry practice, a portion of the proceeds from the sale of the Note were deposited with UMB Bank, N.A. ("Escrow Agent"), as agent for Bankers Trust as Trustee for GTE Pensions Trust pursuant to the Cash Management Agreement among Bankers Trust as Trustee for GTE Pensions Trust, the Escrow Agent, and FDA.  Pursuant to the Cash Management Agreement and the Securities Purchase Agreement, FDA was permitted to seek disbursements from the Escrow Agent to fund the Project, provided that such disbursements were for bona fide expenses incurred in connection

with the Project, and were set forth in FDA's construction budget. Section 3.2 of the Securities

Purchase Agreement specifically provided *inter alia*:

> Subject to the terms of this Section 3.2, the Issuer may from time to time seek disbursements of amounts held by the Escrow Agent. Subject to the limitations provided below, if the Authorized Holders determine, in their reasonable discretion, that a disbursement requested by the Issuer is for a bona fide expense of the Issuer incurred in connection with the Project in compliance with the requirements of this Agreement, the Purchasers shall approve the request for such disbursement. In no event, however, shall the Purchasers be required to approve a request for a disbursement more frequently than once in any 30-day period. The Purchasers shall not be obligated to approve any request for a disbursement that is not for bona fide expenses of the Issuer incurred in compliance with this Agreement. *See* Securities Purchase Agreement at § 3.2.

All such funds held by the Escrow Agent were disbursed to FDA on or before July 2,

2001 and Fidelity never refused an FDA request for a disbursement.

11.     Plaintiffs admit that the Cash Management Agreement and the Securities

Purchase Agreement governed the use of money held by the Escrow Agent. Answering further,

Plaintiffs admit that pursuant to the Disbursement Schedule contained in Schedule 2.2 of the

Securities Purchase Agreement, after disbursements in the amount of $10,044,849.68 were made

in accordance therein, the balance of the funds available, in the amount of $4,445,150.32, were

disbursed to the Escrow Agent to be disbursed in accordance with the Cash Management

Agreement and the other Transaction Documents. Pursuant to the Cash Management Agreement

and the Securities Purchase Agreement, FDA was permitted to seek disbursements from the

Escrow Agent to fund the Project, provided that such disbursements were for bona fide expenses

incurred in connection with the Project and were set forth in the Project's budget. This cash

disbursement arrangement was consistent with industry standards for real estate development

transactions similar to the Project. All such funds held by the Escrow Agent were disbursed to

FDA on or before July 2, 2001 and Fidelity never refused an FDA request for a disbursement.

Plaintiffs deny the remaining allegations in paragraph 11.

12.     Plaintiffs admit that pursuant to the terms of § 3.2 of the Securities Purchase Agreement, FDA was permitted to seek disbursements of amounts held by the Escrow Agent. Subject to the limitations set forth in the Securities Purchase Agreement, the Cash Management Agreement and the other Transaction Documents, if Fidelity determined, in its reasonable discretion, that a disbursement requested by FDA was for a bona fide expense incurred in connection with the Project, Plaintiffs were required to approve the request for such disbursement. *See* Securities Purchase Agreement at § 3.2. All such funds held by the Escrow Agent were disbursed to FDA on or before July 2, 2001 and Fidelity never refused an FDA request for a disbursement. Answering further, Plaintiffs deny the remaining allegations in paragraph 12.

13.     Plaintiffs admit that pursuant to the terms of § 3.2 of the Securities Purchase Agreement, FDA was permitted to seek disbursements of amounts held by the Escrow Agent. Answering further, Plaintiffs admit that payments made by FDA pursuant to the Note were to be made to Deutsche Bank, New York. Answering further, Plaintiffs state that FDA made no payments under the Note. Plaintiffs deny the remaining allegations in paragraph 13.

14.     Plaintiffs admit that pursuant to the Pledge Agreement, Bentley Bay and Development Investors pledged to Fidelity (i) all of their respective ownership interests in FDA and (ii) all obligations owing by FDA to each of them respectively. Plaintiffs deny the remaining allegations in paragraph 14.

15.     Plaintiffs admit that Mr. Olivieri signed the Guaranty in his personal capacity, which requires him to guarantee repayment of all sums due under the Note. Plaintiffs deny the remaining allegations of paragraph 15.

16.    Plaintiffs admit that the Construction Loan required as a condition precedent to an initial advance by Colonial under the Construction Loan that FDA close its unsecured loan with GTE Pensions Trust.  Plaintiffs deny the remaining allegations in the first sentence of paragraph 16.  Answering further, Plaintiffs state that GTE Pensions Trust, through Fidelity, extended a loan to FDA, and did not make an equity investment in FDA.  Answering further, Plaintiffs admit that the Construction Loan references and defines GTE Pensions Trust's loan to FDA as the "Unsecured Loan."  Additionally, consistent with GTE Pension Trust's financing being a loan and not equity, Fidelity, on behalf of Bankers Trust as Trustee, entered into an Intercreditor Agreement with Colonial which defined Fidelity, in its role as discretionary investment manager for Bankers Trust as Trustee on behalf of GTE Pensions Trust, as the "Subordinate Lender." Answering further, Plaintiffs admit that GTE Pensions Trust did not have a security interest in the Project, but rather held as collateral (i) all of Bentley Bay's and Development Investors' respective ownership interests in FDA and (ii) all obligations owing by FDA to each of those entities respectively.  Plaintiffs further admit that pursuant to the terms of § 3.2 of the Securities Purchase Agreement, FDA was permitted to seek disbursements of amounts held by the Escrow Agent, subject to the limitations set forth in the Securities Purchase Agreement, the Cash Management Agreement and the other Transaction Documents, for bona fide expenses relating to the Project.  All such funds held by the Escrow Agent were disbursed to FDA on or before July 2, 2001 and Fidelity never refused an FDA request for a disbursement.  Answering further, Plaintiffs deny the remaining allegations in paragraph 16.

17.    Plaintiffs deny the allegations in paragraph 17.

18.    Plaintiffs deny the allegations in paragraph 18.  Answering further, Plaintiffs state that the Note provides for an interest rate of twenty-one percent (21%) per annum, compounded monthly in arrears.

19.    Plaintiffs deny the allegations in paragraph 19.

20.    Plaintiffs admit that FDA authorized the issuance and sale to Bankers Trust as Trustee of GTE Pensions Trust of up to $14,500,000 of Notes.  Pursuant to the terms of the Securities Purchase Agreement, FDA, as maker, issued the Note, with a face value of $14,500,000 to Bankers Trust as Trustee of GTE Pensions Trust as the Note holders.  Answering further, Plaintiffs deny the remaining allegations in the first sentence of paragraph 20 and the allegations in the second and third sentences of paragraph 20.  Plaintiffs state that the Note provides for an interest rate of twenty-one percent (21%) per annum, compounded monthly in arrears.  Plaintiffs state that the Note, a lawful debt instrument and not equity, was a product of extensive negotiation between Fidelity, on the one hand, and FDA, on the other, and FDA, as evidenced by its execution and issuance of the Note, consented to the application of Massachusetts law to the Note.  Section 6.1 of the Note set forth the parties' express agreement that Massachusetts law governs the Note:

> This Note shall be governed by, and construed in accordance with, the substantive law of The Commonwealth of Massachusetts without regard to the application of choice of law principles.  If any provision of this Note is held to be invalid or unenforceable by a court of competent jurisdiction, the other provisions of this Note shall remain in full force and effect.  Subject to the foregoing, it is the express intention of the Issuer and the Holder to conform strictly to any applicable usury laws.  Accordingly, all agreements between the Issuer and the Holder, whether now existing or hereafter arising, and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity of this Note or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money delivered to the Issuer as the purchase price for this Note or otherwise advanced, in each case pursuant to the terms of this Note or the other Transaction Documents, or for the payment or performance of any covenant or obligation contained herein or in any of the

other Transaction Documents exceed the maximum amount permissible under applicable law. * * * *See* Note at § 6.1.

Answering further, Plaintiffs state that Massachusetts has a legally sufficient relationship to the negotiation, execution and implementation of the terms of the Securities Purchase Agreement, the Note and the other Transaction Documents.  Fidelity's offices and headquarters are in Massachusetts, as conceded by Mr. Olivieri in his counterclaim in paragraph 40.  The Transaction Documents were collected and held by Fidelity's counsel in Massachusetts, Mr. Olivieri's signatures on the Transaction Documents, other than the Note, were delivered to Fidelity in Massachusetts and Fidelity's decisions to close on the Note and fund the Note purchase price were made in Massachusetts.  Additionally, Mr. Olivieri physically signed the Note on behalf of FDA in New York at the offices of Fidelity's counsel and delivered the Note to Fidelity's counsel in those offices.  Fidelity's decisions as discretionary investment manager, on behalf of GTE Pensions Trust, to authorize disbursements under the Securities Purchase Agreement and the Cash Management Agreement were also made in Massachusetts.  Further answering, at the time of the closing on the Note, Fidelity obtained an opinion letter from Alan W. Levine, FDA's general counsel, which stated that Massachusetts law would govern the Note. Plaintiffs deny the remaining allegations in paragraph 20.

21.      Plaintiffs deny the allegations in the first sentence of paragraph 21.  Plaintiffs state that Fidelity exercised its contractual rights under the Transaction Documents, consistent with industry practice, to ensure that the disbursements requested by FDA were being used for bona fide expenses relating to the Project, that the Project would be completed within the Project's budget, free from defects, and that condominium units would be sold on market terms and conditions.  Such conduct did not harm FDA.  Answering further, Plaintiffs admit that § 9.1 of the Securities Purchase Agreement provides *inter alia* that "[t]he Issuer shall operate the

Property and perform all activities incidental thereto, all in strict accordance and compliance with the terms of this Agreement and the other Transaction Documents, the Business Plan, the Budget, and all Approvals, Legal Requirements, Senior Loan Documents and Permitted Encumbrances [as defined in the Securities Purchase Agreement] * * *." Plaintiffs state that pursuant to the terms of § 3.2 of the Securities Purchase Agreement, FDA was permitted to seek disbursements of amounts held by the Escrow Agent, subject to the limitations set forth in the Securities Purchase Agreement, the Cash Management Agreement and the other Transaction Documents, for bona fide expenses relating to the Project. All such funds held by the Escrow Agent were disbursed to FDA on or before July 2, 2001 and Fidelity never refused an FDA request for a disbursement. Answering further, Plaintiffs deny the remaining allegations in paragraph 21.

22.     Plaintiffs admit only that the Transaction Documents speak for themselves. Answering further, Plaintiffs admit that consistent with industry practice, Fidelity hired a construction consultant to monitor the progress of the Project on a monthly basis. The construction consultant had no decision making authority for the Project. Plaintiffs state that FDA was permitted to seek disbursements from the Escrow Agent for bona fide expenses relating to the Project. All such funds held by the Escrow Agent were disbursed to FDA on or before July 2, 2001 and Fidelity never refused an FDA request for a disbursement. Answering further, Plaintiffs deny the remaining allegations in paragraph 22.

23.     Plaintiffs deny the allegations in the first sentence of paragraph 23. Answering further, Plaintiffs deny the allegations in the second sentence of paragraph 23, insofar as such allegations purport to describe Fidelity's conduct. Answering further, Plaintiffs are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in

the second sentence of paragraph 23 to the extent such allegations purport to describe Colonial's conduct.  Answering further, Plaintiffs deny the remaining allegations in paragraph 23.

24.    Plaintiffs deny the allegations in paragraph 24.  Answering further, Plaintiffs state that FDA, not Colonial, hired Keystone Construction  ("Keystone") and was responsible for supervising Keystone.  Plaintiffs state that Fidelity had no ability to fire the inspector for the Project.  Plaintiffs further state that in addition to Keystone's mismanagement of the Project, FDA's own actions and the actions of Mr. Olivieri jeopardized completion of the Project and created significant cost overruns.  FDA had initially estimated that the so-called "hard costs" of the Project would total approximately $43,756,981, pursuant to the budget contained in Schedule 1(B) of the Securities Purchase Agreement.  Prior to its bankruptcy filing, however, FDA dramatically revised upward its calculations, projecting $53,197,982 in hard costs to complete, not including over $13 million of liens filed against the Project.  FDA failed to obtain a construction bond for Keystone, despite the fact that such a bond was required by the Keystone construction contract and the Transaction Documents, thereby exposing FDA and its creditors, including Bell Atlantic Master Trust, to potential liability for Keystone's construction mistakes and delays.  FDA also waived construction supervision by the Project's architect, creating a situation where construction of the Project was inconsistent with the permitted architectural plans.  Further, FDA relieved Keystone of its contractually set guaranteed maximum price for the Project, without the consent of either Colonial or Fidelity.  In violation of the Transaction Documents, an affiliate of FDA also entered into a side agreement with Keystone which provided that Keystone would share 50% of its construction fee for the project with this FDA affiliate.  The FDA affiliate in turn was supposed to render certain "consulting services" to Keystone.  FDA never disclosed this arrangement to Fidelity and Fidelity only independently

learned of this arrangement in the fall of 2003.  Upon information and belief, FDA also paid significant consulting fees to Mr. Diaz as a consultant to the Project, notwithstanding that Mr. Diaz was also employed as Colonial's inspector for the Project, thereby compromising his independence as a representative of Colonial.  FDA also had Mr. Olivieri's daughter on FDA's payroll, even though she was living in California and performed no work in connection with the Project.  Finally, by the fall of 2003, there had not been a single "change order" issued by FDA for the Project, in spite of significant budget overruns and schedule delays.

25.    Plaintiffs deny the allegations in paragraph 25.  Answering further, Plaintiffs state that FDA never provided Fidelity with a written request to terminate Keystone, and orally requested Fidelity's consent to terminate only in September 2003.  Fidelity informed FDA that it would respond to FDA's request only after FDA identified a licensed replacement contractor acceptable to Colonial.  Yet, FDA only identified such a contractor to Fidelity in December 2003, thereby making it effectively impossible prior to that date to fire Keystone without risking the loss of the Project's building permits and funding under the Construction Loan.  Plaintiffs deny that Fidelity directly, or through an agent, ever managed or attempted to manage the Project.  Plaintiffs state that FDA, who had hired Keystone, also mismanaged the Project, exercised poor business judgment and engaged in potential self dealing, as set forth in greater detail in paragraph 24.

26.    Plaintiffs deny the allegations in the first sentence of paragraph 26.  Answering further, Plaintiffs state that GTE Corporation was acquired by a subsidiary of Bell Atlantic Corporation by merger, effective as of June 30, 2000 and Bell Atlantic Corporation changed its name to Verizon Corporation, effective September 22, 2000.  Plaintiffs admit the allegations in the second sentence of paragraph 26.  Plaintiffs deny the allegations in the third sentence of

paragraph 26.  Answering further, Plaintiffs state that Verizon Investment Management Trust terminated Bankers Trust Company *n/k/a* Deutsche Bank as Trustee of the GTE Service Corporation Plan for Employees' Pensions Trust effective December 31, 2000 and named Mellon Trustee effective December 31, 2000.  Answering further, Plaintiffs admit the allegations in the fourth, fifth and sixth sentences of paragraph 26.

27.     Plaintiffs deny the allegations in paragraph 27.  Answering further, Plaintiffs state that the Note, a lawful debt instrument and not equity, and the Guaranty were products of extensive negotiation between Fidelity, on the one hand, and FDA, on the other, and FDA, as evidenced by its execution and issuance of the Note, consented to the application of Massachusetts law to the Note, as set forth more fully in paragraph 20.

28.     Plaintiffs admit that FDA, as maker, issued the Note, with a face value of $14,500,000 to Bankers Trust as Trustee for GTE Pensions Trust as the Note holders.  Answering further, Plaintiffs deny the remaining allegations in the first sentence of paragraph 28.  Answering further, Plaintiffs state that the Maturity Date of the Note is defined in § 1.3 of the Note, which provides *in toto*:

> In any event, the entire outstanding principal balance of this Note, together with any accrued and unpaid interest and other amounts due hereunder or under any other Transaction Document, if not earlier paid or due and payable in accordance with the terms of this Note, shall be due and payable on the date (the "Maturity Date") which is the earliest of (i) the third (3rd) anniversary of the date of this Note, or (ii) such other date on which the entire outstanding balance of this Note becomes due and payable in accordance with its terms, or (iii) the maturity date under the promissory note from Issuer to Colonial Bank, an Alabama banking corporation, in the original principal amount of $48,000,000 dated of even date herewith, as such maturity dates may be extended pursuant to the terms of such promissory note.

Plaintiffs admit the allegations in the second sentence of paragraph 28.

29.     Plaintiffs deny the allegations in paragraph 29.

30.     Plaintiffs admit only that the Note provides for an interest rate of twenty-one percent (21%) per annum, compounded monthly in arrears.  Plaintiffs deny the remaining allegations in paragraph 30.

31.     Plaintiffs admit only that the Note provides for an interest rate of twenty-one percent (21%) per annum, compounded monthly in arrears.  Answering further, Plaintiffs state that Massachusetts law, not Florida law, applies to the Note and that Massachusetts has no usury limits on the calculation of interest.  Furthermore, even if Florida law were found to apply to the Note, § 6.1 of the Note contains a savings clause which provides that applicable interest under the Note will not exceed the limit as prescribed by law:

> If, from any circumstance or contingency whatsoever, fulfillment of any provision of this Note or of any other Transaction Document at the time performance of such provision shall be due shall involve transcending any limit validly prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and, if from any such circumstance or contingency, the Holder shall ever receive as interest or otherwise an amount which would exceed the maximum rate of interest permitted by applicable law, the amount of such excess shall be applied to a reduction of the indebtedness evidenced by this Note, and not to the payment of interest.  If such excessive interest exceeds such indebtedness, the amount of such excessive interest shall be refunded to FDA.

Accordingly, if Florida law is found to apply to the Note, Bell Atlantic Master Trust is entitled to the maximum amount of interest allowed by Florida law.  As evidenced by the proof of claim ("Proof of Claim") Fidelity filed on behalf of Bell Atlantic Master Trust on July 12, 2004 in FDA's bankruptcy case, Bell Atlantic Master Trust is not seeking to enforce interest on the Note above the limit allowed by Florida law.  In the Proof of Claim, Bell Atlantic Master Trust is claiming a simple interest rate of 24.99% per annum on the Note.  Mr. Levine's opinion letter concerning the Note also addressed *inter alia*, whether interest rates set forth in the Note would violate Florida's usury laws if Florida law was found to govern the Note.  Mr. Levine opined that if Florida law were found to apply to the Note, "the interest to be charged under the

[Note] would be lawful if the Purchaser has received * * * as interest or as payment in the nature of interest, amounts not exceeding twenty-five percent (25%) per annum * * *." *See* Opinion Letter at pg. 5.  As noted *supra*, Bell Atlantic Master Trust is claiming a 24.99% per annum interest rate under the Note.  Plaintiffs deny the remaining allegations in paragraph 31.

32.    Plaintiffs admit only that Fidelity acted as discretionary investment manager and collateral agent on behalf of GTE Pensions Trust.  Plaintiffs deny the remaining allegations of paragraph 32.

## COUNT I
## Cancellation of the sums due Bell Atlantic pursuant to Fla. Stat. § 687.071

33.    Plaintiffs hereby incorporate by reference their responses to paragraphs 1 - 32 as though fully set forth herein.

34.    Plaintiffs admit that FDA, as maker, issued the Note, with a face value of $14,500,000 to Bankers Trust as Trustee of the Bell Atlantic Master Trust as the Note holders.  Answering further, Plaintiffs admit that pursuant to the Pledge Agreement, Bentley Bay and Development Investors pledged to Fidelity (i) all of their respective ownership interests in FDA and (ii) all obligations owing by FDA to each of them respectively.  Plaintiffs admit that the Note was guaranteed by Mr. Olivieri pursuant to the terms of the Guaranty.  Plaintiffs further admit that Bell Atlantic Master Trust is successor in interest under the Transaction documents to the GTE Pensions Trust.  Plaintiffs deny the remaining allegations in paragraph 34.

35.    Plaintiffs admit that GTE Service was a subsidiary of GTE Corporation, a New York corporation.  Plaintiffs deny the remaining allegations in the first sentence of paragraph 35.  Answering further, Plaintiffs state that GTE Corporation is headquartered in New York, NY.  Plaintiffs admit that a portion of the proceeds from the sale of the Note were deposited with UMB Bank, N.A., as agent for Bankers Trust as Trustee of the Bell Atlantic Master Trust

pursuant to the Cash Management Agreement among Plaintiffs, the Escrow Agent, and FDA. Plaintiffs deny the remaining allegations in paragraph 35.

36. Plaintiffs deny the allegations in the first sentence of paragraph 36. Plaintiffs admit that payments made by FDA pursuant to the Note were to be made to Bankers Trust Company *n/k/a* Deutsche Bank, New York. Answering further, Plaintiffs state that FDA made no payments under the Note. Plaintiffs deny the remaining allegations in paragraph 36.

37. Plaintiffs admits that Mr. Olivieri executed the Guaranty in New York City. Plaintiffs deny the remaining allegations in paragraph 37.

38. Plaintiffs admit only that the Note provides for an interest rate of twenty-one percent (21%) per annum, compounded monthly in arrears. Answering further, and as more fully set forth in paragraphs 20 and 31, Massachusetts law governs calculation of interest under the Note, and even if Florida law were found to apply, Bell Atlantic Master Trust is seeking an interest rate under the Note that is permitted by Florida law. Plaintiffs deny the remaining allegations in paragraph 38.

39. Plaintiffs admit the allegations in the first sentence of paragraph 39. Answering further, Plaintiffs admit that Fidelity is headquartered in Massachusetts. Plaintiffs deny the remaining allegations in paragraph 39. Answering further, and as more fully set forth in paragraphs 20 and 31, Massachusetts law governs calculation of interest under the Note, and even if Florida law were found to apply, Bell Atlantic Master Trust is seeking an interest rate under the Note that is permitted by Florida law. Answering further, and as more fully set forth in paragraph 20, Massachusetts also bears a legally sufficient relationship to the negotiation, execution and implementation of the terms of the Securities Purchase Agreement, the Note and the other Transaction Documents. Plaintiffs further state that Fidelity was selected as collateral

agent and discretionary investment manager for Bell Atlantic Master Trust with full authority to make investment decisions, execute loan documents, approve disbursements and otherwise administer or enforce the loan made to FDA. Answering further, Plaintiffs state that Bankers Trust acted as Trustee for GTE Pensions Trust.

40.     Plaintiffs admit only that Fidelity acted as collateral agent and discretionary investment manager for GTE Pensions Trust. Answering further, Plaintiffs deny the remaining allegations in the first sentence of paragraph 40. Plaintiffs admit the allegations in the second sentence of paragraph 40. Answering further, as more fully set forth in paragraphs 20 and 31, Massachusetts law governs calculation of interest under the Note, and even if Florida law were found to apply, Bell Atlantic is seeking an interest rate under the Note that is permitted by Florida law. As more fully set forth in paragraph 20, Massachusetts also bears a legally sufficient relationship to the negotiation, execution and implementation of the terms of the Securities Purchase Agreement, the Note and the other Transaction Documents. Plaintiffs deny the remaining allegations in paragraph 40.

41.     Plaintiffs admit only that the Project was located in Florida and that GTE Pensions Trust extended the loan to FDA for the purpose of financing the Project. Answering further, Plaintiffs deny the allegations in the second sentence of paragraph 41. Answering further, as more fully set forth in paragraphs 20 and 31, Massachusetts law governs calculation of interest under the Note, and even if Florida law were found to apply, Bell Atlantic Master Trust is seeking an interest rate under the Note that is permitted by Florida law. Plaintiffs deny that the closing on the Transaction Documents occurred in Miami, Florida. As more fully set forth in paragraph 20, Massachusetts also bears a legally sufficient relationship to the negotiation, execution and implementation of the terms of the Securities Purchase Agreement,

the Note and the other Transaction Documents.  Plaintiffs deny the remaining allegations in paragraph 41.

42.       Plaintiffs deny the allegations in paragraph 42.

43.       Plaintiffs deny the allegations in paragraph 43.  Answering further, as more fully set forth in paragraphs 20 and 31, Massachusetts law governs calculation of interest under the Note, and even if Florida law were found to apply, Bell Atlantic Master Trust is seeking an interest rate under the Note that is permitted by Florida law.  As more fully set forth in paragraph 20, Massachusetts also bears a legally sufficient relationship to the negotiation, execution and implementation of the terms of the Securities Purchase Agreement, the Note and the other Transaction Documents.

44.       Plaintiffs deny the allegations in paragraph 44.  Answering further, as more fully set forth in paragraphs 20 and 31, Massachusetts law governs calculation of interest under the Note, and even if Florida law were found to apply, Bell Atlantic Master Trust is seeking an interest rate under the Note that is permitted by Florida law.  As more fully set forth in paragraph 20, Massachusetts also bears a legally sufficient relationship to the negotiation, execution and implementation of the terms of the Securities Purchase Agreement, the Note and the other Transaction Documents.

<u>**COUNT II**</u>
<u>**Recharacterization of Bell Atlantic's "debt" as equity**</u>

45.       Plaintiffs hereby incorporate by reference their responses to paragraphs 1 - 44 as though fully set forth herein.

46.       Plaintiffs admit that Fidelity was aware that the Construction Loan required as a condition precedent to an initial advance by Colonial under the Construction Loan that FDA

close its unsecured loan with GTE Pensions Trust. Plaintiffs deny the remaining allegations in paragraph 46.

47.    Plaintiffs admit that GTE Pensions Trust agreed to provide mezzanine debt financing to FDA so that FDA could meet the condition precedent of the Construction Loan. Plaintiffs deny the remaining allegations in paragraph 47.

48.    Plaintiffs admit that at the time GTE Pensions Trust agreed to provide mezzanine debt financing to FDA, it was aware that Colonial would obtain a first mortgage secured by the real property owned by FDA. Plaintiffs deny the remaining allegations in paragraph 48.

49.    Plaintiffs deny the allegations in paragraph 49. Answering further, Plaintiffs state that the terms of the Transaction Documents demonstrate that GTE Pensions Trust was making a loan to FDA. Answering further, Plaintiffs state that the Construction Loan references and defines GTE Pensions Trust's loan to FDA as the "Unsecured Loan."

50.    Plaintiffs admit only that pursuant to the Pledge Agreement, Bentley Bay and Development Investors pledged to Fidelity (i) all of their respective ownership interests in FDA and (ii) all obligations owing by FDA to each of them respectively. Plaintiffs deny the remaining allegations in paragraph 50.

51.    Plaintiffs deny the allegations in paragraph 51. Plaintiffs state that Fidelity exercised its contractual rights under the Transaction Documents, consistent with industry practice, to ensure that the disbursements requested by FDA were being used for bona fide expenses relating to the Project, that the Project would be completed within the Project's budget, free from defects, and that condominium units would be sold on market terms and conditions. Such conduct did not harm FDA.

52.    Plaintiffs deny the allegations in paragraph 52.

## COUNT III
### Claim for Declaratory Judgment That Mr. Olivieri Should Be Relieved of His Obligations Under the Guaranty Because Bell Atlantic and Fidelity Mismanaged FDA In Such A Way As To Harm Mr. Olivieri's Interest

53.     Plaintiffs hereby incorporate by reference their responses to paragraphs 1 - 52 as though fully set forth herein.

54.     The first sentence of paragraph 54 contains legal conclusions to which no response is required.  Plaintiffs deny the remaining allegations of paragraph 54.  Plaintiffs state that no fiduciary duty was created by the Note holders and Mr. Olivieri under the terms of the Guaranty.  Answering further, Plaintiffs state that pursuant to the terms of the Note, a document that was extensively negotiated between Fidelity, on the one hand, and FDA, on the other, the parties expressly agreed that no fiduciary duty was created between the Note holders and FDA.  Section 6.7 of the Note provides *in toto*:

> *This Note shall not be deemed to create any relationship between the Issuer and the Holder other than a debtor-creditor relationship*, and in no event shall this Note be deemed to create a joint venture or partnership between the Issuer and the Holder.  *See* Note at § 6.7.  (Emphasis added).

55.     Plaintiffs deny the allegations in paragraph 55.  Answering further, and as more fully described in paragraph 24, FDA itself mismanaged the Project, exercised poor business judgment, improperly used escrow funds, and engaged in potential self dealing.

56.     Plaintiffs deny the allegations in paragraph 56.

## COUNT IV
### Breach of Fiduciary Duty Claim

57.     Plaintiffs hereby incorporate by reference their responses to paragraphs 1 - 56 as though fully set forth herein.

58.     Plaintiffs deny the allegations in paragraph 58.  Plaintiffs state that no fiduciary duty was created by the Note holders and Mr. Olivieri under the terms of the Guaranty nor by

any actions taken or representations made by the Plaintiffs.  Answering further, Plaintiffs state pursuant to § 6.7 of the Note, Fidelity, on the one hand, and FDA, on the other, expressly agreed that that no fiduciary duty was created between the Note holders and FDA, but rather expressly agreed that a debtor-creditor relationship was formed.

59.     Plaintiffs deny the allegations in paragraph 59.  Answering further, and as more fully described in paragraph 24, FDA itself mismanaged the Project, exercised poor business judgment, improperly used escrow funds, and engaged in potential self dealing.

60.     Plaintiffs deny the allegations in paragraph 60.

61.     Plaintiffs deny the allegations in paragraph 61.

Plaintiffs deny the WHEREFORE clause in its entirety.

### FIRST AFFIRMATIVE DEFENSE

Mr. Olivieri has failed to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Mr. Olivieri's claims are barred because such claims can only be asserted properly by FDA.

### THIRD AFFIRMATIVE DEFENSE

Mr. Olivieri's claims are barred by his and FDA's own material breaches of the Transaction Documents.  Contrary to the terms of the Transaction Documents, FDA and Mr. Olivieri acted to jeopardize completion of the Project and created significant cost overruns.  FDA had initially estimated that the so-called "hard costs" of the Project would total approximately $43,756,981, pursuant to the budget contained in Schedule 1(B) of the Securities Purchase Agreement.  Prior to its bankruptcy filing, however, FDA dramatically revised upward its calculations, projecting $53,197,982 in hard costs to complete, not including over $13 million of liens filed against the Project.  FDA failed to obtain a construction bond for Keystone, despite the fact that such a bond was required by the Keystone construction contract and the Transaction Documents, thereby exposing FDA and its creditors, including Plaintiffs, to potential liability for Keystone's

construction mistakes and delays. Upon information and belief, FDA also waived construction supervision by the Project's architect, creating a situation where construction of the Project was inconsistent with the permitted architectural plans. Further, FDA relieved Keystone of its contractually set guaranteed maximum price for the Project, without the consent of either Colonial or Fidelity. Upon information and belief, in violation of the Transaction Documents, an affiliate of FDA also entered into a side agreement with Keystone which provided that Keystone would share 50% of its construction fee for the project with this FDA affiliate. The FDA affiliate in turn was supposed to render certain "consulting services" to Keystone. FDA never disclosed this arrangement to Fidelity and Fidelity only independently learned of this arrangement in the fall of 2003. FDA also paid significant consulting fees to Rolando Diaz as a consultant to the Project, notwithstanding that Mr. Diaz was also employed as Colonial's examiner for the Project, thereby compromising his independence as a representative of Colonial. FDA also had Mr. Olivieri's daughter on FDA's payroll, even though she was living in California and performed no work in connection with the Project. Finally, by the fall of 2003, there had not been a single "change order" issued by FDA, in spite of significant budget overruns and schedule delays.

### FOURTH AFFIRMATIVE DEFENSE

Mr. Olivieri's claims are barred by the terms of the Transaction Documents.

### FIFTH AFFIRMATIVE DEFENSE

Mr. Olivieri's claims are barred by the doctrines of waiver, laches and estoppel.

### SIXTH AFFIRMATIVE DEFENSE

Mr. Olivieri's claims are barred by his own bad faith and/or unclean hands.

### SEVENTH AFFIRMATIVE DEFENSE

Mr. Olivieri has failed to allege fraud with particularity, as required by Fed.R.Civ.P. 9(b) and 12(b).

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs reserve the right, upon completion of its investigation and discovery, to assert such additional defenses as may be appropriate in the circumstances.

Respectfully submitted,


/s/ Brian H. Mukherjee
Anthony M. Feeherry, P.C. (BBO # 160860)
Brian H. Mukherjee, Esq. (BBO # 643954)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts  02109
Telephone:  617-570-1000
Facsimile: 617-523-1231

Attorneys for Fidelity Management Trust Company, as Investment Manager and Collateral Agent and not Individually

Dated:  November 23, 2004